IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 21-cr-20044-JTF |
| | ) |
| **COREY MATTHEW LURRY,** | ) |
| | ) |
| Defendant. | ) |

_____

**REPORT AND RECOMMENDATION**
_____

Before the court by order of reference is a motion to suppress evidence filed by defendant Corey Matthew Lurry on August 24, 2021. (ECF Nos. 21 & 24.) The government filed a response on September 14, 2021. (ECF No. 28.) For the reasons below, it is recommended that the motion to suppress be denied.

## I.   PROPOSED FINDINGS OF FACT

The following proposed findings of fact are based on the testimony of Memphis Police Department ("MPD") Sergeant Lacy Hardaway and Lieutenant Charles Jenkins, both of whom testified credibly at the evidentiary hearing held on December 2, 2021. The evidence presented at the hearing included an arrest warrant for Lurry, (Ex. 1.1), Lurry's advice of rights form, (Ex. 1.2), the detention log, (Ex. 1.3.), Lurry's case history summary, (Ex. 1.4), audio-video footage from Sergeant Hardaway's body camera, (Ex. 2),

Lurry's individualized education program ("IEP"), (Ex. 3), audio-video footage from Officer Morton's body camera,[1] (Ex. 4), and audio-video footage of the police interview with Lurry's girlfriend, Andreika Fitzpatrick, (Ex. 5).

While the police interrogation at issue in this motion to suppress took place on July 8, 2020, the events leading to Lurry's interrogation actually began on July 4, 2020. As Fitzpatrick later told police, on that date, she and Lurry were at a Fourth of July gathering at Lurry's grandmother's house. (Ex. 5.) Fitzpatrick got into an argument with her sister Juanita Williamson and Williamson's son, Jeremy Williamson. (Ex. 5.) The disagreement escalated and ultimately led to Jeremy Williamson striking Lurry's mother. (Ex. 5.) After that, according to Fitzpatrick, Jeremy Williamson left the party and came back in a black Chrysler and fired shots at the house. (Ex. 5.)

According to an MPD police report, on July 6, 2020, at 3:40 p.m., two of Fitzpatrick's nephews, Tyrell and Donnell Williamson, reported an aggravated assault to the MPD. (Ex. 1.1.) Tyrell Williamson stated that he and his brother were at Zena's Market when Lurry drove up in a tan Toyota Camry and fired shots at them with a red and black handgun. (Ex. 1.1.) Around 9:40 p.m. that

---

[1] Officer Morton, whose first name is unknown, did not testify at the hearing.

same day, Lurry drove by and fired shots at the Williamson's home. (Ex. 1.1.) One of Fitzpatrick's brothers was shot. (Exs. 1.1; 5.)

On July 8, 2020, Lieutenant Jenkins and his partner Lieutenant Brett Williams went to the Williamson residence to investigate the shooting. (Tr. 31-32; 34.) While Lieutenant Jenkins was standing on the porch and showing a photographic lineup to residents of the home, a sedan drove past the house. Tyrell Williamson told police that the vehicle belonged to the suspect in the shootings, Corey Lurry. (Tr. 32.) The driver made a u-turn and yelled something out the window while driving past the residence. (Tr. 32.) Lieutenants Jenkins and Williams got in their car and attempted to follow the vehicle, but eventually abandoned pursuit because of Lurry's aggressive driving. (Tr. 33.) The lieutenants proceeded downtown to swear out a warrant for Lurry's arrest. (Tr. at 35.) In the meantime, Fitzpatrick called the 911 dispatcher and stated that she wanted to speak to police. (Tr. at 37; Ex. 2.)

Officer Morton responded to the call and arrived at 3427 Farmville Road to speak to Fitzpatrick. (Ex. 3.) Lurry was also on the scene and appeared agitated and upset, pacing back and forth behind Fitzpatrick. (Ex. 4.) Fitzpatrick explained to Officer Morton that her family had been harassing and threatening her and her children ever since the July 4th altercation. (Ex. 4.)

A few minutes later, Sergeant Hardaway arrived on the scene. (Ex. 2.) He observed Lurry and Fitzpatrick who appeared "very

irate, yelling, and screaming." (Tr. 11.) When Sergeant Hardaway arrived, he did not know whether Lurry was a victim or a suspect, he "just [knew] that the detectives wanted to talk to him." (Tr. 12.) Sergeant Hardaway saw a Toyota parked in front of the house with four children in the car (who based on body camera footage appeared to be under the age of seven, including a newborn). (Tr. 14; Ex. 2.) There were also several adults coming in and out of the house. (Tr. 14.) At the time, Sergeant Hardaway was a Crisis Intervention Team ("CIT") Officer with the Tillman Task Force. (Tr. 9.) CIT officers are trained to deescalate volatile situations and to get suspects into custody without use of force. (Tr. 9.)

Officer Morton then received a call from Lieutenant Williams who informed him that Lurry was a suspect in an aggravated assault. (Ex. 4.) Officer Morton explained the situation to an unidentified fellow officer on the scene: "[Lurry and Fitzpatrick] are suspects in an aggravated assault down the street. And while the detectives were over there talking to the victims, they drove off. . . The guy right there on the porch is the guy we need to get. He's probably gonna run and fight us when he figures out what's going on." (Ex. 4.)

Officers suggested to Lurry that he should go down to the station and give a statement. (Ex. 2.) Lurry expressed concern that the last time he spoke to the police at the police station, he was arrested. (Ex 2.) Sergeant Hardaway said, "No, all they're

gonna do is get a statement from you." (Ex. 2.) As the conversation continued, Lurry became increasingly agitated, and Sergeant Hardaway stated, "you've gotta understand, you're the victim." (Ex. 2.) Officer Morton stated, "You're not on the wrong side of this issue." (Ex. 2.) Sergeant Hardaway then said, "when we say you're the victim, meaning, you're not the suspect, you're not going to get arrested. . . . The only way that we can make an arrest [of the Williamsons], you all have to give y'all's statement though." (Ex. 2.) At the time that Sergeant Hardaway made these statements, he was unaware that Lurry was a suspect or that a warrant was being prepared for Lurry's arrest. (Ex. 2.)

A few moments later, Officer Morton pulled Sergeant Hardaway aside and said, "I just got off the phone with Brett Williams and Jenkins. They say grab [Fitzpatrick and Lurry] and put them in the precinct. They're downtown right now putting a warrant on them. . . . They're not the victims, they're the suspects. These are the ones who just ran from Williams and Jenkins in his car." (Ex. 2.) Right after that, Officer Clarence McNeil received a call and told Sergeant Hardaway that he and his partner had to leave to respond to another call. (Tr. 19.) This left only three officers on the scene. (Tr. 19.)

Sergeant Hardaway spoke to Officer Morton away from the suspects and asked, "okay, are they suspects or victims?" (Ex. 2.) Officer Morton replied that they were suspects. Sergeant Hardaway

-5-

said, "well then we need to grab them then." (Ex. 2.) Officer Morton said, "I know but I, well, I was saying that but we're at their family's house and there's only . . . three of us here." (Ex. 2.)

Sergeant Hardaway then approached Lurry and said, "why were you saying they were trying to lock you up, because from what y'all are telling us, y'all are victims." (Ex. 2.) When asked at the hearing why he did not inform Lurry he was a suspect, Sergeant Hardaway said it was because, "I didn't want to fight with him . . . I didn't want to escalate . . . there was a lot of people on that scene. . . . Even before . . . the officer told me that he had a warrant, I had already told him that he was a victim. So, I stayed with that story." (Tr. 27-28.) Sergeant Hardaway told Lurry that everyone who witnessed the July 4th incident needed to come down to the station to give a statement. (Ex. 2.) Sergeant Hardaway told Fitzpatrick she could drive her own car and Lurry would ride with him so the couple could not "collaborate" on their statements. (Ex. 2.) Lurry was not cuffed and rode in the back of Sergeant Hardaway's car. (Ex. 2.)

Outside the station, Sergeant Hardaway told Lurry to make sure to tell the officers inside that he was afraid for his life. (Ex. 2.) At this point, Lurry was still not cuffed, and Sergeant Hardaway allowed him to help Fitzpatrick with their baby when she arrived at the station. (Ex. 2.) Sergeant Hardaway brought Lurry

-6-

inside the station and placed him in an interview room. (Ex. 2.) Lurry was shackled to the bench by another officer. (Ex. 2.)

Lieutenant Jenkins interviewed Lurry at the station beginning at 1:42 p.m. (Tr. 43.) Before asking any questions, Lieutenant Jenkins presented an advice of rights form to Lurry. (Tr. at 43.) At the hearing, Lieutenant Jenkins explained his process of going over this form with a suspect:

> [T]ypically the way I do it is anyone that says that they have—a juvenile or anyone that doesn't have a very high education, like [Lurry] indicated he had a third-grade education, I would read these to him rather than to ask him to read them. . . . [W]hen I read it to someone, I will actually sit next to them with the paper on a clipboard, and I will have my fingers—which helps me to remember to read every word of the right, and I will read it as I pass the words. And, for instance, you have the right to remain silent, I would tell someone that that means you don't have to talk to me. Do you understand that. Do you have any questions? If you don't have any questions, put your initials on this line. That means you understand this right and this right only. And once they say they understand that right and initial it, then we'll move on, and we will repeat for all the rights there.

(Tr. 43-44.) Lurry requested that the rights be read aloud to him.[2] (Tr. 64.)

Lieutenant Jenkins read Lurry each right and Lurry wrote his initials next to each one to indicate that he understood that right. (Tr. at 45.) It took six minutes to complete the form. (Tr. 47.) Lieutenant Jenkins testified credibly that Lurry indicated

---

[2]At the hearing, Lurry presented his IEP that shows he has a "Specific Learning Disability." (Ex. 3.)

that he understood his rights and that he would not have proceeded with the interview if Lurry had indicated that he did not understand them. (Tr. at 49.) Lurry was offered food and drink, but he declined. (Tr. 49.) In the middle of Lurry's interview, Lieutenant Jenkins took a break to interview Fitzpatrick with Lieutenant Williams from 2:45 to 3:00 p.m. (Tr. 51.) Fitzpatrick's interview was recorded by Lieutenant Williams's body camera, but Lurry's was not. (Tr. 54.) Lurry's interview resumed at 3:00 p.m. (Tr. at 51.) During the interview Lurry admitted that he had a weapon but did not own it or carry it on him. (ECF No. 21 at 3.) The officers then ended the interview at 4:05 p.m. when Lurry asked for a lawyer. (Tr. 49-50.) A federal grand jury in the Western District of Tennessee returned a two-count indictment against Lurry on March 25, 2021, charging him with violations of 18 U.S.C. § 922(g)(1)&(9): unlawful possession of a firearm by a felon, and unlawful possession of a firearm by a person convicted of misdemeanor domestic assault.

## II.  PROPOSED CONCLUSIONS OF LAW

Lurry seeks to suppress his statement because, he argues, the statement was made involuntarily as a result of police coercion. (ECF No. 41 at 2.) The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. When considering the voluntariness of a confession, courts consider the "totality of

the circumstances" to determine whether a statement was the "product of an essentially free and unconstrained choice by its maker." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). The government bears the burden of showing by a preponderance of the evidence that Lurry's statement was voluntary. United States v. Johnson, 351 F.3d 254, 260 (6th Cir. 2003). There are three requirements for a finding that a statement was involuntary due to police coercion: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999).

**A.   Whether the Police Activity Was Coercive**

Lurry argues that the officers' statements that he was a victim and was not going to be arrested were objectively coercive. "[T]he success of a criminal investigation often hinges on obtaining information from uncooperative individuals." Williams v. Withrow, 944 F.2d 284, 289 (6th Cir. 1991), aff'd in part, rev'd in part, 507 U.S. 680 (1993). "[E]ffective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect." Id. However, "police promises of leniency and threats of prosecution may be coercive if they are 'broken or illusory.'" United States v.

-9-

Siler*,* 526 F. App'x 573, 575 (6th Cir. 2013) (quoting Johnson*,* 351 F.3d at 262). Additionally, "a promise is problematic if a police officer leads a defendant to believe that he 'will receive lenient treatment when this is quite unlikely,' and makes a promise, without authorization by the prosecution." Id.

Lurry likens the officers' conduct to that in Siler, 526 F. App'x at 573. In that case, Siler was arrested for a probation violation and was interviewed about a burglary. Id. The officer told Siler that he would speak with the District Attorney to try to get him into drug rehabilitation if he helped him locate a gun from the burglary. Id. at 574. He told Siler that "he could not promise him anything but that he was the one who typed the warrants." Id. When Siler asked the officer to clarify what he meant, the officer replied, "it all has to do with whether you get charged or whether you get sent to rehab." Id. When asked if he could get an agreement in writing, the officer said, "then we would have to charge you." Id. Siler expressed concern about what would happen to him if he cooperated, and the officer once again said that he was the one who typed the warrants, and if he did not type a warrant, Siler would not be charged with a crime. Id. Siler asked who would be charged and the officer replied, "nobody's going to get charged with the gun. . . I want the gun because it means a lot to the [victim] . . . it doesn't have anything to do with you . . . nobody is going to get charged with the gun." Id. A few weeks

-10-

later, Siler was interviewed again, and the officer repeated the assurances that Siler would not be charged. Id. Siler was subsequently charged with felony gun possession. Id. The Sixth Circuit held the officer's repeated illusory promises were objectively coercive. Id.

Lurry argues that the police officers' statements that Lurry was a victim, not a suspect, and that he would not be arrested are illusory promises like those made in Siler. The statements that Lurry was a victim, and not a suspect, are certainly not illusory promises. Unlike the statements made in Siler that assured the defendant he would not be prosecuted, these statements did not promise Lurry anything. They were a psychological tactic to keep Lurry calm and deescalate a potentially volatile situation, and "not all psychological tactics are considered unconstitutional." Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994)(holding that an officer's misrepresentations to a suspect that the police had found his fingerprints at the crime scene and a victim had identified him in a photo array were constitutional).

The second statement, that Lurry would not be arrested if he went down to the station, is a closer question. When Lurry expressed concern that he would be arrested if he went to the police station, Sergeant Hardaway stated, "when we say you're the victim, meaning, you're not the suspect, *you're not going to get arrested*." (Ex. 2.)(emphasis added). At first glance, this

-11-

statement might appear to be an illusory promise. However, Sergeant Hardaway made the statement before he knew that Lurry was a suspect or that there was a warrant for his arrest. When he arrived on the scene, Sergeant Hardaway only knew that detectives wanted to speak to Lurry. (Tr. 12.) He believed that Lurry was a victim based on Lurry and Fitzpatrick's statements. (Ex. 2.) Moments after Sergeant Hardaway made the statement in question, Officer Morton informed Sergeant Hardaway that Lurry was a suspect and that an arrest warrant was being sworn out for him. (Ex. 2.) At that point, Sergeant Hardaway knew that Lurry would be arrested. After he became aware of this, Sergeant Hardaway did not repeat the assurances that Lurry would not be arrested. (Ex. 2.) Instead, Sergeant Hardaway told everyone who had witnessed the July 4th incident that they needed to provide a statement to police at the station. (Ex. 2.)

It is also clear that the statements made by patrol officers at the scene were not intended to extract an incriminating statement from Lurry. "The threshold determination that a confession was 'involuntary' for due process purposes is the requirement that police 'extorted [the confession] from the accused by means of coercive activity.'" McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)(quoting United States v. Rohrback, 813 F.2d 142, 144 (8th Cir. 1987)). In McCall, the petitioner claimed that police conduct was coercive because "he had been

-12-

handcuffed, placed on the ground, and surrounded by numerous police officers who 'yelled' and pointed weapons at him." Id. at 459. The Sixth Circuit held that "the display of weapons was not intended to 'extort' a confession by coercive means." Id. at 460. Rather, the weapons were carried as a "protective measure." Id.

Here, as in McCall, the intention of the police officers in telling Lurry that he was a victim and would not be arrested was not to coerce Lurry into making an incriminating statement. Rather, the officers made those statements so that they could get Lurry to the police station without risking violence or flight — a protective measure. When officers initially arrived on the scene, they were unaware that Lurry was a suspect in an aggravated assault. (Tr. 12.) What they did know was that Lurry appeared upset and agitated, and that there were several small children present in the car. (Tr. 11-14; Ex. 2.) Sergeant Hardaway told Lurry that he appeared to be a victim so that he could get Lurry to the station safely without the use of force. (Tr. 27-28.) When Sergeant Hardaway and Officer Morton were informed that Lurry had just fled from Jenkins and Williamson, and that the officers were preparing a warrant for his arrest, they made the tactical decision not to inform Lurry that he was a suspect. (Ex. 4.) Officer Morton commented that there were only three officers at the scene and that they were outnumbered by the adults at the house. (Ex. 2.) Sergeant Hardaway testified credibly that he did not correct

Lurry's misunderstanding that he was not a suspect because, "I didn't want to fight with him . . . I didn't want to escalate . . . there was a lot of people on that scene. . . . Even before . . . the officer told me that he had a warrant, I had already told him that he was a victim. So, I stayed with that story." (Tr. 27-28.) Lurry was not arrested on the scene and he rode with Sergeant Hardaway uncuffed. (Ex. 2.) When Lurry arrived at the station he was shackled to a bench and read his Miranda rights by Lieutenant Jenkins before the interview began. (Tr. 43; Ex. 2.) There is no evidence that during the interview Lieutenant Jenkins or Williams made any assurances that Lurry would not be prosecuted or arrested. Although the police misled Lurry about being a victim instead of a suspect, that police conduct did not coerce Lurry into making an incriminating statement.

The undersigned finds that no police coercion occurred. "This finding alone should end the inquiry because proof of police coercion is a threshold requirement for Lurry's claim." McCall, 863 F.2d at 460. However, even if police coercion had in fact occurred, Lurry would still not prevail because the alleged "coercion" was insufficient to overbear his will and was not a crucial motivating factor in Lurry making the statement in question. Mahan, 190 F.3d at 422.

**B.   Whether Lurry's Will Was Overborne**

"When determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.'" Mahan, 190 F.3d at 422 (quoting Ledbetter, 35 F.3d at 1067. "Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." Id. at 433. Lurry also argues that his Miranda waiver was not made knowingly, voluntarily, and intelligently. (ECF No. 21 at 6.) There are two dimensions to the court's inquiry as to whether a defendant has effectively waived his Miranda rights. First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Colorado v. Spring, 479 U.S. 564, 573 (1987). Second, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Id.; see also Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005) ("[C]laims regarding Miranda waivers must demonstrate not only that the confession was voluntary but also that the confession was knowing and intelligent."). "To determine whether the confession was knowing and intelligent, we apply a totality of the circumstances test to ascertain whether

-15-

[defendant] understood his right to remain silent and to await counsel." Clark, 425 F.3d at 283. The government bears the burden of showing by a preponderance of the evidence that Lurry's Miranda waiver was knowing and voluntary. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

The totality of the circumstances here demonstrate Lurry's will was not overborne, nor was his Miranda waiver invalid. Lurry was twenty-nine years old at the time of the interview. (Ex. 3.) Lurry told Lieutenant Jenkins that he had a third-grade education, but did not inform him he had a learning disability. (Tr. at 58; Ex. 3.) Because of Lurry's low education level, Lieutenant Jenkins read and explained each right on the advice of right form aloud to Lurry. (Tr. 43-44.) Lurry signed his initials next to each right to indicate that he understood them. (Tr. 45; Ex. 1.2.)

"The underlying police-regulatory purpose of Miranda compels that [the totality of the circumstances surrounding the interrogation] be examined . . . primarily from the perspective of the police." Garner v. Mitchell, 557 F.3d 257, 262-63 (6th Cir. 2009) (en banc) (stating that because the officers "had no reason to believe that Garner misunderstood the warnings, and because it is undisputed that the officers were otherwise reasonable and careful in giving the warnings and obtaining the confession, there is no basis for invalidating Garner's Miranda waiver"). Lieutenant Jenkins testified credibly that Lurry indicated that he understood

his rights and that he would not have proceeded with the interview if he had indicated otherwise. (Tr. at 49.)

Lurry was questioned for about two hours, from 1:45 to 4:05 p.m. with a fifteen-minute break in the middle.[3] (Tr. 43; 51; 49-50.) He was offered food, water, and a bathroom break. (Ex. 1.3.) There is no evidence that he was physically threatened. Additionally, after Lurry made the incriminating statement, he requested a lawyer and ended the interview, showing that he was aware of and understood his rights. Under the totality of the circumstances, the undersigned finds that Lurry's will was not overborne, nor was his Miranda waiver invalid.

## C. Whether the Officers' Conduct Was a Crucial Motivating Factor for Lurry to Make a Statement

Finally, the undersigned finds that the officers' conduct was not a crucial motivating factor in Lurry's decision to make a statement. There are no allegations that Lieutenants Jenkins or Williams made any statements that Lurry would not be charged or prosecuted. There is also no evidence that Lurry inquired about the patrol officers' statements at the scene. Unlike the defendant in Siler who clearly made a statement based on the assurances of a police officer, Lurry voluntarily made his statement to police.

## III. RECOMMENDATION

---

[3] There is some discrepancy in the record about the length of Lurry's interview. However, the longest possible time the interview could have been was two hours and five minutes.

-17-

For the reasons above, it is recommended that Lurry's motion to suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

January 19, 2022
Date

**NOTICE**

**NOTICE WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**